William H. KEENER, N. Scott Angevine and William D. Shannahan, John E. Hein, Don Scott and Gilbert F. Martin, individually and as Trustees of Osage Hills Subdivision, Plaintiffs-Appellants,

v.

Ira E. BERRY, Melvin C. Karr and Chester A. Love, individually and as officers of Berry-Karr, Inc., a corporation, Berry-Karr, Inc., a corporation, Robert G. Reim, Robert Murphy, Phillip Hallof, Jr., Robert E. Staed and Francis Scheidegger, Defendants-Respondents.

No. 53146.

Supreme Court of Missouri, Division No. 2.

Sept. 9, 1968.

Tenney, Dahman & Mathewson, St. Louis, for plaintiffs-appellants.

Chester A. Love, Edwin Rader, Clayton, for Ira E. Berry, Melvin C. Karr, Chester A. Love and Berry-Karr, Inc., defendants-respondents.

GEORGE P. ADAMS, Special Judge.

This suit to enjoin the construction of a road over Lot 117 of Osage Hills Subdivision in Kirkwood, Missouri is brought by plaintiffs-appellants as trustees of the subdivision under a "Trust Agreement and Indenture of Restrictions" and "as owners on behalf of all owners of lots in said subdivision". The defendants-respondents are a corporation which proposes to use such road

as ingress and egress to another subdivision to be located adjoining Osage Hills; its officers and directors; and the Mayor and Councilmen of Kirkwood.

From a decree denying an injunction, plaintiffs appeal.

A motion to transfer this cause to the Court of Appeals, filed by respondents, was taken with the case on its merits. It should be sustained. A statement of only such facts as relate to this action is required.

▮ In their initial brief, appellants attempt to invoke the jurisdiction of this court on the ground that the "amount in controversy" exceeds $15,000 and "also involved is the validity of negative easements in the building restrictions on the subdivision real estate". In their brief in opposition to the motion to transfer, they reassert the monetary ground for our jurisdiction, but abandon any further contention that title to real estate is involved.

In inverse order, it can be said of the latter ground, "it has been definitely settled, contrary to the appellant's assertion, that 'in an injunction suit of this nature title to real estate is not involved in the constitutional (jurisdictional) sense.' Barnes v. Anchor Temple Association, Mo., 369 S.W.2d 192, 193." Eilers v. Alewel et al., Mo., 393 S.W.2d 584, 586.

Since we have concluded that there is an insufficient showing that the amount in dispute exceeds $15,000, we proceed as if this action does in fact "involve", as distinguished from merely "affect", property values in the subdivision. Sunray DX Oil Company v. Lewis et al., Mo., 426 S.W.2d 44, 51 (20).

In doing so, we assume, but do not decide, that the agreement and indenture of restrictions granting the trustees the power "for the benefit of all other owners of lots in said subdivision, to prevent any infringement or compel the performance of any covenants or restrictions" therein, permits consideration of depreciation in value of property in the subdivision resulting from the construction of a road over Lot 117.

We also assume, but do not decide, that the mere allegation in the petition (and admitted in defendants' answers) that plaintiffs also bring this action "as owners on behalf of all owners of lots in said subdivision" is sufficient to constitute a class action and thereby permit consideration of depreciation in value to all property in the subdivision.

In their petition plaintiffs plead that they will suffer "irreparable damages" if defendants build the road; that the property of the owners in the subdivision "will be depreciated in value"; and that "it will be practically impossible to ascertain with any degree of certainty the amount of damages that will thus be sustained by said unlawful use of said Lot 117".

▮ No money judgment was sought by plaintiffs. The amount in dispute must, then, " 'be determined by the money value of the relief to plaintiff, or of the loss to defendant, should the relief be granted, or vice versa, should the relief be denied.' Frank Schmidt Planing Mill Co. v. Mueller et al., 347 Mo. 466, 147 S.W.2d 670, 671 (2)". Sunray DX Oil Company v. Lewis et al., supra, l. c. 49(14). It must "affirmatively appear from the record" that the amount in dispute exceeds the minimum jurisdictional amount and such determination cannot be left to "speculation or conjecture". Sunray DX Oil Company, supra, l. c. 49(15). It must also be disclosed with "certainty" and "regardless of all contingencies". Long v. Norwood Hills Corporation, Mo., 360 S.W.2d 593, 596(3).

▮ The record is void of any showing of a loss or value to defendants if relief is granted or denied.

The only evidence in the record relating to the value of the property in the subdivision and the effect of the use of Lot 117 for a road on the value of such prop-

erty, was by a real estate appraiser. He testified, in part, as follows:

"Q Can you describe Heatherbrook Lane? A Heatherbrook Lane is one of the original streets in Osage—now known as Greenbriar Country Club, which was built around a golf course, swimming pool and tennis courts—built in the late 20's—was late to develop—now is about 75 percent improved with good homes, the present day range being twenty-five to forty thousand dollars.

\* \* \* \* \* \*

"Q At my request have you made a determination as to what, in your opinion, the effect of building a public road through lot 117 would be on the fair market value of the homes on Heatherbrook and other homes in the subdivision? A Yes.

\* \* \* \* \* \*

"The construction of a public road onto this lot, in my opinion, would have an adverse effect on the surrounding properties. It would be naturally much more felt on the properties adjoining it or across the street from it, but the whole subdivision as a whole—

"Q Are you speaking of Greenbriar? A Osage or Greenbriar—same thing—it would have some detrimental effect. It is difficult to measure, but it had been known that the rock ground out there—has a lot of rock and construction has required blasting in many cases, such as lot 244. I went through there—

\* \* \* \* \* \*

"The formation of the ground is such that construction of improvements, sewers and excavation for pavements would require a lot of heavy traffic—trucks—resulting in considerable noise, dirt and traffic hazard, and, in my opinion, the changing from a single family residence to a public street would have an adverse effect on the adjoining properties.

\* \* \* \* \* \*

"Q Are you able to give us any range of percentages what this adverse effect might be of the market value on the homes nearby? A I would say it would run from practically nothing up to ten percent, depending on the type of house and location and proximity to the new street—I would say it would be about a five percent loss of value."

The only testimony from which the exact location of any of the homes in the subdivision can be ascertained is that of a Mr. Rutledge, an owner whose lot "adjoins" Lot 117. He testified:

"Q Tell us who else lives in the neighborhood right near this road? A Just on the other side of Heatherbrook also adjacent to the road is Mrs. Kittner, the Waldrons live across the street, the Andersons, the real close ones—the Ridmans directly across the street from me. And the next house is Staed, Robert Staed, and then across from him, Tom Hovey.

"Q Those are— A The immediate ones. One other family, I can't remember the name."

While several property owners (including those owning property on each side of the lot) testified, not one gave an opinion as to the value of his or her property. The only evidence from which the value of the properties in the subdivision can be determined is the appraiser's range of "twenty-five to forty thousand dollars". We can, therefore, only use a $25,000 valuation without resorting to speculation.

The appraiser's conclusion that the depreciation would run from "practically nothing up to ten percent" is equivocal and uncertain. It depends upon a number of undisclosed contingencies such as the "type of house" and "location and proximity to the new street". The nearest that he comes to expressing a certain opinion is, "it would be about a five percent loss of value".

His opinion is limited to "surrounding" and "adjoining" properties, "homes nearby" or properties "across the street". The only properties meeting these characterizations

are the seven or eight residences testified to by Mr. Rutledge.

The depreciation, if any ("practically nothing"), of other properties in the subdivision must depend entirely on prohibited "speculation or conjecture".

Under the most favorable interpretation of the evidence in support of our jurisdiction, it might be said it affirmatively appears from the record that if the relief sought is denied, plaintiffs' loss will be a 5 per cent depreciation in eight $25,000 properties, or $10,000.

In their brief in opposition to the motion to transfer, appellants state "there are six houses near the proposed road, since all the homes are worth at least $25,000 and the six would be worth a minimum of $150,000, of which 10% would be $15,000".

The error in appellants' calculations is that the appraiser did not set ten per cent as the depreciation of *any* home. When asked what effect the road would have on "homes nearby", his ultimate, and only relatively definite opinion, was, "I would say it would be about a five percent loss of value". If "about" five per cent meets the "certainty" requirement of Long v. Norwoods Hills Corporation, supra, then that is the maximum basis upon which to compute the value depreciation on "homes nearby"; and the only "homes nearby" mentioned in the record are the seven or eight testified to by Mr. Rutledge.

Assuming for further observation only that a basis of 10% might be considered as applying to some of the homes, there is no showing which, if any, of these six homes are the "type of house" or in the "location and proximity to the new street" meeting the appraiser's basis for this percentage. The two next door houses might be said to suffer his maximum estimate of 10% but there is no way to determine the depreciation the other four might sustain since in no instance is the "type of house" shown and the appraiser did not attempt to identify them as qualifying for the maximum because of their "location and proximity to the street". The two "across the street" even might suffer the maximum or within one or two per cent thereof. There still remains the last two. Are they "surrounding properties" upon which this road might have an "adverse effect"? If so, what percentage? Since the "adverse effect" of the road would "be naturally *much more* felt on the properties adjoining it or across the street from it", the "adverse effect" of the road on these last two properties would be *much less* felt. But how much? 7%, 6%, 5% or even less down to "practically nothing". The answer, of necessity, depends entirely on prohibited "speculation and conjecture".

If these computative gymnastics serve any useful purpose whatever, it would be to emphasize the speculation that must be indulged in to try and arrive at an accurate "amount in dispute".

Plaintiffs were uncannily prophetic in predicting in their petition that "it will be practically impossible to ascertain with any degree of certainty the amount of damages that will thus be sustained by said unlawful use of said Lot 117".

Respondents' motion to transfer is sustained and the cause is ordered transferred to the St. Louis Court of Appeals.

FINCH, P. J., and DONNELLY, J., concur.

EAGER, J., not sitting.